[Cite as *State v. Jones*, 2016-Ohio-7277.]

STATE OF OHIO )
)ss:
COUNTY OF SUMMIT )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

STATE OF OHIO

    Appellee

v.

MICHAEL A. JONES

    Appellant

C.A. No.     27732

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     CR 2014 10 3070

DECISION AND JOURNAL ENTRY

Dated: October 12, 2016

CARR, Presiding Judge.

{¶1}   Defendant-Appellant, Michael Jones, appeals from his convictions in the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}   Following a tip he received from an informant, Detective Paul Laurella asked another detective to help him conduct nighttime surveillance at a house on First Street in Barberton.  The informant stated that Richard Keith, the resident of the house, and another unknown man would be manufacturing methamphetamine there sometime that evening.  Accordingly, the two detectives waited outside the house and watched for any suspicious behavior.  After several hours, Detective Laurella observed someone inside the house turn on a window fan and, soon afterward, smelled a distinct order, which he associated with methamphetamine production.  He and his fellow detective then called for assistance and entered the house with the help of other officers.

{¶3} Inside the house, the police discovered numerous ingredients associated with methamphetamine production as well as a two-liter bottle. The two liter bottle contained an active chemical mixture that Detective Laurella recognized as the reactionary phase of the methamphetamine production process. The police searched the remainder of the house and found Jones in one of the home's bedrooms, lying beside his sleeping fifteen-year-old cousin. The police ultimately arrested both Keith and Jones, and Detective Laurella later interviewed Jones at the police station. During his interview, Jones admitted that both he and Keith had been manufacturing methamphetamine, with each man fulfilling a separate role in the manufacturing process.

{¶4} A grand jury indicted Jones on each of the following counts: (1) illegal assembly or possession of chemicals for the manufacture of methamphetamine in the vicinity of a juvenile; (2) illegal manufacture of methamphetamine in the vicinity of a juvenile; and (3) endangering children. Following his trial, a jury found Jones guilty on all three counts. The court sentenced Jones to seven years in prison on his illegal assembly count, seven years in prison on his illegal manufacturing count, and three years in prison on his endangering count. The court ordered all of his prison terms to run concurrently for a total sentence of seven years in prison.

{¶5} Jones now appeals from the trial court's judgment and raises two assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

APPELLANT'S CONVICTION WAS BASED UPON INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION. THE TRIAL COURT ERRED BY DENYING APPELLANT'S CRIM.R. 29 MOTION.

{¶6} In his first assignment of error, Jones argues that his convictions are based on insufficient evidence, and that the trial court erred when it denied his Crim.R. 29 motion for acquittal. We disagree with both propositions.

{¶7} Crim.R. 29(A) provides, in relevant part:

> The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶8} "Methamphetamine is a schedule II controlled substance." *State v. Gregory*, 9th Dist. Summit No. 27523, 2015-Ohio-4901, ¶ 18. The Revised Code prohibits any person from "knowingly assembl[ing] or possess[ing] one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II * * *." R.C. 2925.041(A). Likewise, it prohibits any person from "knowingly manufactur[ing] or otherwise engag[ing] in any part of the production of a controlled substance." R.C. 2925.04(A). If an individual commits either of the foregoing acts on

the same parcel of real property on which a child is present, the individual is also guilty of child endangering. R.C. 2919.22(B)(6), (E)(1).

{¶9} Detective Laurella testified that, on September 29, 2014, he decided to conduct surveillance at a house on First Street because he received a tip from an informant. The informant had told him that Richard Keith, the resident of the house, and "an unknown guy" would be manufacturing methamphetamine that evening. Detective Laurella asked another detective, Detective Antenucci, to accompany him and testified that they arrived at the house at about 9:30 p.m.

{¶10} While Detective Laurella was still inside his car looking for a place to conduct his surveillance, he saw two people walking down First Street. He testified that he recognized one of the individuals as being involved with methamphetamine production and that, as he watched, the two individuals walked around the back of the house that he intended to surveil. Detective Laurella testified that he decided to have Detective Antenucci watch the front of the house while he watched the back. He ultimately chose to conduct his surveillance from an alley that was approximately 40 to 50 feet away from the house.

{¶11} Detective Laurella testified that he watched the house for several hours and, during that time, received another tip that Keith and his associate "were definitely going to start [manufacturing methamphetamine] sometime tonight." As he watched the house, he saw someone inside turn on a small double window fan. Detective Laurella stated that the activation of the fan was significant to him because, in his experience, people commonly use fans to vent chemicals when they are producing methamphetamine. Consistent with his experience, Detective Laurella soon noticed a strong chemical smell that he recognized as "the odor that's produced when you manufacture methamphetamine."

{¶12} Because they believed someone was in the process of manufacturing methamphetamine inside the home, Detective Laurella and Detective Antenucci requested back up. Other officers soon arrived, and the police knocked on the door of the house. Keith answered the door, and Detectives Laurella and Antenucci went inside. Detective Laurella stated that the chemical smell that he recognized outside was even stronger in the house. He and his fellow officers located several individuals in the house, including Jones. Detective Laurella testified that Jones was lying in the same bed as his sleeping cousin, but was fully clothed, appeared very nervous, and "was sweating profusely." Approximately 20 to 30 feet away from the bedroom where the police found Jones, Detective Laurella testified that they found an active meth lab.

{¶13} Detective Laurella testified that, inside the house, the police found numerous items that are used in the production of methamphetamine. Specifically, they found bottles of acetone, lye, and drain opener together in a trash receptacle, a Pyrex dish containing ice water, plastic tubing, a coffee maker with no coffee pot, Zippo lighter fluid, a bottle of unknown acid that was thought to be muriatic acid, Nitrile gloves, pseudoephedrine pills, lithium batteries, foil, and aluminum nitrate cold packs. The police also found a two-liter bottle that Detective Laurella identified as a reactionary vessel for the reactionary phase of methamphetamine production. He testified that the bottle was emitting a hissing sound when he came close to it and had a very strong chemical smell. Although Detective Laurella initially thought that someone had left the bottle's cap loosened for ventilation purposes, he saw that the structure of the bottle had actually failed and that the bottle was leaking fuel and ammonia gas. He testified that he quickly put on his fireproof gear and took the bottle outside.

{¶14} Detective Laurella testified that Jones was taken into custody in connection with the active methamphetamine lab that the police discovered. On October 1, 2014, he interviewed Jones at the police station. During the interview, Jones admitted that he brought pseudoephedrine pills with him to the house on First Street and that he and Keith were in the process of producing methamphetamine when the police arrived. Specifically, he stated that Keith had heated the fuel for him while he soaked the pseudoephedrine pills in acetone, cut batteries to access their lithium centers, and added the content of the cold packs to the mixture. Detective Laurella testified that Jones' mention of using acetone to help breakdown the pseudoephedrine pills solidified his belief that Jones was involved in the production process because that was "even more than some meth cooks * * * know to do."

{¶15} As part of his investigation, Detective Laurella testified that he also searched NPLEx. He explained that NPLEx is a database that law enforcement and pharmacies use to track the sales of pseudoephedrine. He testified that the database showed that Jones had purchased: (1) 1.44 grams of pseudoephedrine from a pharmacy in Akron on September 23, 2014; and (2) 2.4 grams of pseudoephedrine from a pharmacy in Fairlawn on September 28, 2014. He stated that individuals who purchase pseudoephedrine pills for methamphetamine production purposes often buy the pills at different pharmacies to try to avoid detection. He noted that Jones made his second purchase the day before he was arrested in connection with the active methamphetamine lab.

{¶16} Jones argues that his convictions are based on insufficient evidence because there was no evidence that he was involved in the production of methamphetamine on the evening of his arrest. He notes that the police found him in a bedroom, alongside his sleeping cousin and that no methamphetamine production materials were found in that bedroom. He argues that his

mere presence in the house where methamphetamine was being produced was insufficient evidence to show that he knowingly manufactured the drug or knowingly possessed any of the chemicals necessary to manufacture the drug.

{¶17} Viewing the State's evidence in a light most favorable to the prosecution, a rational trier of fact could have concluded that the State set forth sufficient evidence that Jones knowingly possessed illegal chemicals and knowingly manufactured methamphetamine on the night in question. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The State's evidence was not limited to establishing Jones' presence in the house on First Street. The State set forth evidence that he purchased pseudoephedrine pills on two separate occasions in the days before his arrest. It also introduced Jones' interview with Detective Laurella, during which he admitted that he was involved in the manufacturing process. Jones admitted that he purchased pseudoephedrine pills and used acetone to break down the pills while Keith heated fuel for him. He further admitted that he cut apart batteries and added cold packs to the chemical mixture. There was evidence that the house on First Street had a very strong chemical smell when police arrived and that, when Detective Laurella found Jones, he was fully clothed, very nervous, and "sweating profusely." Given all of the evidence the State introduced, the jury reasonably could have concluded that the State proved its case against Jones beyond a reasonable doubt. Consequently, Jones' convictions are not based on insufficient evidence, and his first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE JURY VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶18} In his second assignment of error, Jones argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶19}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**{¶20}** At trial, Richard Keith testified for the defense. Keith testified that Jones was his nephew by marriage and that, on the night in question, Jones had come to his house to shower and rest. According to Keith, Jones was asleep at the time that he began manufacturing methamphetamine. Keith confirmed that he pleaded guilty to reduced charges after he was indicted in connection with this incident. He insisted that Jones was not involved in the manufacturing process. Nevertheless, Keith admitted that he made several recorded phone calls while being held at the jail on his charges. He admitted that, in those phone calls, he disclaimed responsibility for the two-liter bottle that the police found at his house and stated that it was Jones who had possession of the bottle. According to Keith, he lied during the phone calls because his case had not yet been resolved and he was unwilling to take responsibility for his actions before that occurred.

{¶21} Jones argues that his convictions are against the manifest weight of the evidence because Keith's testimony established that Keith was responsible for manufacturing the methamphetamine that the police found at his house. According to Jones, the jury lost its way when it convicted him because the evidence established that he was not in possession of any methamphetamine-related items when the police found him and that he had merely come to Keith's house to sleep.

{¶22} Having reviewed the record, we cannot conclude that the jury lost its way when it convicted Jones. Although Keith testified that Jones did not help him produce methamphetamine on the evening in question, he admitted that he had previously made statements implicating Jones. Moreover, the State produced the recording of Jones' interview with Detective Laurella, during which Jones admitted that he purchased pseudoephedrine pills and helped Keith manufacture methamphetamine that evening. Detective Laurella testified that Jones possessed very specific knowledge about the manufacturing process, as he was able to tell the detective that acetone could be used to help break down pseudoephedrine pills. The detective also testified that Jones did not appear to have been sleeping when the police arrived because he was fully clothed, nervous, and "sweating profusely." The jury here "was in the best position to evaluate the credibility of the witnesses, and this Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge simply because the jury chose to believe certain witnesses' testimony." *State v. Velez*, 9th Dist. Lorain No. 14CA010683, 2016-Ohio-2875, ¶ 11. Upon review, this is not the exceptional case where the jury clearly lost its way. *See Otten*, 33 Ohio App.3d at 340. Jones' argument that his convictions are against the manifest weight of the evidence lacks merit. As such, his second assignment of error is overruled.

III.

**{¶23}** Jones' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

MOORE, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.